GULF REFINING COMPANY et al. v. ROBERT V. FRAZIER,
By Next Friend, etc.

Middle Section. November 19, 1932.

Petition for Certiorari denied by Supreme Court, March 18, 1933.

Charles C. Trabue and Avery Handly, of Nashville, for Gulf Refining Company.

Thomas B. Finley, of Lebanon, for Bridgewater and Ingram.

Walter S. Faulkner, of Lebanon, for Frazier.

FAW, P. J.   Robert V. Frazier, a minor, suing by his father, A. L. Frazier, as next friend, brought this action against Gulf Refining Company, a corporation, R. A. Bridgewater and W. G. Ingram to recover $35,000 as damages for personal injuries suffered by the plaintiff as the result of alleged negligence of defendant Ingram, who, it is alleged, was, at the time such injuries were inflicted, a servant of his co-defendants.

The case was tried to a jury in the Circuit Court upon the issues made by pleas of not guilty filed by all of the defendants to the plaintiff's declaration, and the jury found the issues in favor of the plaintiff and against the defendants and fixed the plaintiff's damages at $12,000, whereupon the Court rendered judgment accordingly.

Motions for a new trial on behalf of all the defendants were seasonably made and overruled, and the defendants thereupon prayed an "appeal" to this Court, which was granted by the trial court and perfected by all of the defendants.

The "appeal" in this case must be construed to mean an appeal in the nature of a writ of error, as a simple appeal does not lie from a

judgment in an action at law. Spalding v. Kincaid, 1 Shan. Cas., 31; Manley v. Chattanooga, 1 Tenn. App., 65.

For convenience, we will continue to refer to the parties as plaintiff and defendants, as they appeared on the record in the trial court.

In this Court, the Gulf Refining Company has filed a separate assignment of errors, and defendants Bridgewater and Ingram have filed a joint assignment of errors, but have included therein certain assignments on behalf of Bridgewater not available to Ingram, and one assignment on behalf of Ingram not available to Bridgewater, as will be later pointed out herein.

The first assignment on behalf of all the defendants is that there was no evidence to sustain the verdict of the jury. This assignment seeks to present a question not now open for consideration by this Court, for the reason that the ruling of this Court on a former appeal is the law of the case.

The record now before us for review is the record of the second trial of this case in the Circuit Court. The first trial resulted in a verdict of the jury and judgment thereon in favor of the plaintiff and against the three defendants for $12,000, which judgment was reversed by this Court on appeal in error and the cause remanded for a new trial on account of errors committed at the trial below; but the reversal was not on the ground that there was no evidence to support the verdict of the jury.

To the contrary, this Court, on the first appeal of this case, expressly overruled an assignment that there was no evidence to support the verdict. However, under our practice, an assignment, in a case of this character, that there was no evidence to support the verdict of the jury, does not challenge the amount of the verdict apart from the question of the liability of the defendants, and, on the former appeal of the present case, this Court pretermitted the consideration of an assignment that the verdict was excessive and made no ruling upon that subject, but held that there was material evidence upon which the jury could find the defendants liable to respond in damages to the plaintiff.

The issues presented by the pleadings were the same at the second trial as at the first. In the written opinion of this Court (prepared by Judge Crownover and filed on March 18, 1931), on the first appeal, it was said:

"The facts necessary to be stated are, that in September, 1929, at about 7:30 or 8 in the morning, A. L. Frazier, of Wilson County, was carrying his seven year old son, Robert Victor, plaintiff in this action, to school, and was driving a Ford car with a small truck body built on the rear. The car had one seat and the boy was sitting by his father. Frazier was traveling along the Nashville-Sparta Turnpike, in an easterly direction,

at a moderate rate of speed. The road at this point was straight for three or four hundred yards. It was drizzling rain. A passenger bus was approaching Frazier, traveling at about twenty-five or thirty miles an hour. Observing that he was likely to pass the bus on or near a culvert or bridge over a small stream, Frazier slowed down to let it cross before they met. When Frazier's car and the bus were passing each other there was a space of three or four feet between them. Frazier's car was in good running order. While passing the bus, having slowed down, Frazier's car was just rolling along, when it was struck in the rear by an oil truck belonging to defendant Bridgewater and driven by Ingram. The blow of the oil truck knocked the Frazier car into the side of the passing bus. When the Frazier car was thrown against the bus that was going in the opposite direction, the bus threw the front of the car around in the other direction. The little boy was thrown from his seat twelve or fifteen feet across the pike on to rocks in the ditch and against a rock fence.

"The oil truck was traveling at the rate of about thirty miles an hour in the same direction as the Frazier automobile and about two hundred yards behind it. The driver of the oil truck, Ingram, could see the bus, Frazier and the bridge and knew that the bus and Frazier had to pass each other. He proceeded at thirty miles an hour and when within sixty feet of Frazier, Frazier slowed down. Ingram put on his brakes but they failed to hold and he crashed into the rear of Frazier's car, knocking it into the bus, and then ran off into the ditch. The blow of the oil truck broke down one of the wheels of the Frazier car, tore out the truck body and knocked a hole in the transmission housing.

"The defendant Gulf Refining Company was a Texas corporation, engaged in the business of selling gasoline and oil, and was domesticated in the State of Tennessee. It had entered into a written contract with R. A. Bridgewater to act as its local selling agent at Lebanon. .

"Bridgewater received a commission depending on the amount of sales made, and was subject to general supervision and control by the defendant. He employed servants to drive the trucks and distribute gasoline, etc.

"The truck involved in this action was owned by Bridgewater but carried the name of the Gulf Refining Company. Its license was registered in the name of Gulf Refining Company and the license was paid for by said Company. The privilege and ad valorem taxes for carrying on the business were paid by the Gulf Refining Company and license issued in its name.

"Ingram, the driver of the oil truck, was hired by Bridgewater, the local agent. . . .

"The first assignment of error is that there was no evidence to support the verdict. We are of the opinion that this assignment is not well made and must be overruled.

"The proof shows that when Ingram first saw the Frazier car he was about two hundred yards behind it. The road was straight for about three hundred to four hundred yards, Ingram was able to see the large passenger bus coming, meeting Frazier's car and his truck. The culvert or bridge over a small stream was in plain view. The bus was about seventy-five yards from Frazier's car. The bus was running at the rate of about thirty miles an hour, Frazier at about fifteen, and Ingram on the oil truck at about twenty-five to thirty-five miles an hour. It was raining and the oiled road was slick. Several witnesses testified that Ingram did not lessen his speed but turned to his left as if to pass the Frazier car, that when he saw he could not pass it before the bus reached it, he turned back to his right, behind the Frazier car, and crashed into it.

"Ingram testified that his brakes would not hold when they were wet and that he knew that it was raining and that the brakes were wet; that he put on his brakes when about sixty feet behind Frazier but they would not hold.

"Several witnesses testified that just after the accident Ingram stated that it was his fault; that he saw Frazier one hundred and fifty yards back but his brakes wouldn't check his car and that he seemed to go faster.

"We are of the opinion that the testimony shows that Ingram was driving at a reckless rate of speed considering that there was a car ahead, which was being passed by a large passenger bus and that he knew that it was raining and that his brakes were probably wet and that he couldn't make a sudden stop.

"'One may be guilty of operating an automobile at a negligent rate of speed and still be well within the rate prescribed by statute or ordinance.' 1 Berry on Law of Automobiles, sec. 183.

"'The rule is stated in Halzle v. Hargraves, 233 Mich., 238, 206 N. W., 357, as follows:

"Whether the speed at which he was driving was excessive or not did not depend upon any ordinance or statutory traffic rules but upon what was reasonable in view of all the circumstances." 1 Berry on Law of Automobiles, sec. 183, note 69.

"'The driver shall use such care in the operation of his machine as circumstances reasonably require, having at all times proper regard to the rights and safety of others.' 1 Blashfield's Cyc. of Automobile Law, p. 330, sec. 7.

" 'The operator must not drive at a greater speed than is reasonably consistent with the safety of others, under the circumstances, and having regard to the traffic and use of the highway.' 1 Blashfield's Cyc. of Automobile Law, p. 319, sec. 1.

" 'It is usually a question for the jury whether an excessive rate of speed, at which the driver of a motor vehicle is going, at the time of inflicting or sustaining injuries sued for, was a contributing cause of the accident.' 2 Blashfield's Cyc. of Automobile Law, p. 1225, sec. 16.

" 'On conflicting evidence, the question of the rate of speed at which an automobile was going at the time of the accident, or whether it was such as to constitute negligence, is for the jury.' 2 Blashfield's Cyc. of Automobile Law, p. 1763, sec. 6.

"Whether Bridgewater was an independent contractor or was an agent of the Gulf Refining Company, and whether either or both were liable, under the proof in this case, were questions for the jury, and it follows that the motions for peremptory instructions should have been overruled."

With respect to the contention of defendant Gulf Refining Company that Bridgewater was an independent contractor, and that the Refining Company was, therefore, not responsible for the negligence of Bridgewater or his servant, this Court said further in its opinion on the former appeal, the following, viz:

"The written contract between the Gulf Refining Company and Bridgewater is as follows:

" 'This memorandum of agreement made and entered into this 19th day of February, 1925, by and between the Gulf Refining Company of Louisiana, party of the first part, and R. A. Bridgewater, of Lebanon, Tennessee, party of the second part, witnesseth:

" 'The party of the second part agrees to rent a warehouse at ———————— suitable for the storage of oils, rental of said warehouse to be paid by the said party of the first part. Party of the first part agrees to ship party of the second part lubricating oils, illuminating oils, gasoline in car load lots, which shipments are to be received by the party of the second part and sold by him at prices named by party of the first part, all sales of such oils to be for cash, or if on a credit only to such parties as are suitable to the party of the first part and upon terms authorized by them. Where first party orders second party to sell on credit, second party shall deliver a signed receipt; if any gas or oil is shipped out of the station at Lebanon, Tennessee, second party will deliver an original bill of lading from the railroad company, which shall constitute a receipt.

" 'Party of the second part is to be responsible to the party of the first part for all goods shipped to him and is to account for all sales in accordance with above paragraph, sending weekly a statement showing all sales and accounting weekly to party of the first part at their New Orleans, Louisiana, office all moneys received from the sale by him of above named goods. Second party shall render to the party of the first part statement on the first day of each month showing in detail all goods on hand. Second party agrees to pay all drayage and delivery charges, and collect all empty drums and barrels and ship same back to party of the first part as ordered.

" 'It is strictly understood that all goods shipped party of the second part by party of the first part, are the property of. the party of the first part until sold.

" 'On or about the first of each month, party of the first part will send to the party of the second part,' a statement showing the sales made by the party of the second part during the preceding month, remitting to the party of the second part commissions earned on such sales. (Then omitting that part of the contract which pertains only to commissions). Party of the first part reserves the privilege of making shipments from its stock of goods in the hands of the second party, and second party agrees to fill such orders as may be sent them by party of the first part—no commission to be allowed party of the second part on such shipments.

" 'This contract may be terminated by either party upon ten days' written notice to the other party, and upon such termination each party shall settle with the other in full for any and all amounts which may be due by either party to the other.'

"The proof shows that the truck was the property of Bridgewater but was registered in the name of the Gulf Refining Company and the name of the Gulf Refining Company was painted' on the truck. The post office box was in the name of the Gulf Refining Company and the rent of same was paid by the Company. Checks from customers for gas and oil were made payable to the Gulf Refining Company. The license for conducting the business was in the name of the Gulf Refining Company and paid for by the Company, and that Bridgewater paid no tax and had no license to do business in his own name. The company reserved the right to say that the goods should be sold for cash or if on time to whom they should be sold, and it was expressly agreed that the station and the goods belonged to the company until sold.

"In the case of Gulf Refining Company v. Huffman & Weakley, 155 Tenn., 580, 297 S. W., 199, the contract between the parties was in the same words as this contract, and the dealings between

the parties seemed to be much the same as in the case before us. The Supreme Court in that case said:

" 'We seem to have here a form of agreement which creates a relationship not so like that of an independent contractor as of an agency, defined as, "a contract by which one person, with greater or less discretionary power, undertakes to represent another in certain business relations." Baldwin's Bouvier, p. 56. The power under such a relationship may be exercised wholly for the benefit of the principal, or with an interest on the part of the agent, as was here the case, but the relationship is none the less that of agency. Overall was held out and generally recognized as the agent or representative of the Gulf Refining Company, rather than as acting for himself in any independent sense, and we think the record as a whole affords grounds for the conclusion of the jury that such was in fact the relationship. While he appears to have furnished some of the equipment employed in the business, and does not appear to have been directed or controlled in some details of its operation, it is clear that he was controlled and directed in certain important particulars, and in practical effect was subject to the will and direction of his principal in any respect as to which his principal might elect to exercise such control. Applicable to the negligence alleged, we think it apparent that the Gulf Refining Company was in a position to control the manner of the deliveries of its gasoline and to exact the use of safe equipment and the employment of responsible men, since the business was essentially that of the Company, the product sold being its gas, the pumps in use being its property and the payments made by the customers its funds. It was natural and indeed essential to the permanency of its business, to which Overall entertained a relationship terminable at his will, that its good will and its returns should be reasonably safeguarded.

" 'It is the reservation of the right of control of essential details, either express or implied, rather than the actual exercise of the right, that distinguishes the relationship of responsible principal from that of an employer of an independent contractor. "In every case the decisive question is, had the defendant the right to control in the given particular the conduct of the person doing the wrong?" Thompson on Neg., 999, quoted approvingly by Mr. Justice Lurton in Powell v. Const. Co., 88 Tenn., 697, who defines an independent contractor as "one who, exercising an independent employment, contracts to do a piece of work according to his own method, and without being subject to control of his employer, except as to the result of his work." This is the leading definition adopted by Bouvier citing the Powell case.

" 'We are convinced from the record as a whole that there was a reservation of right or power in the Gulf Refining Company to demand and enforce the use of equipment free from unsafe defects, and the use of prudent and responsible employees in the handling of its product—that this right arose by necessary implication, being essential to its protection and success, and that it is therefore legally bound for the negligence here shown.

" 'Whether one is or is not an independent contractor is often on the record presented a mixed question of law and fact. It is so in this case. Evidence was properly admitted showing the dealings between the parties, their course of business, authority exercised by the Company, etc.' Gulf Refining Company v. Huffman & Weakley, supra.

"The defendant Gulf Refining Company cited the case of Texas Co. v. Brice, 26 Fed. (2d), 164, in support of its argument that Ingram was not the agent of the Gulf Refining Company but was the agent of Bridgewater. The contract in that case and the circumstances were somewhat different from those in the case at bar. But the Court in that case preferred to follow decisions not in accord with the case of Gulf Refining Company v. Huffman & Weakley, supra; but as our own Court has settled the proposition on a similar contract and under similar circumstances we must follow our own decisions.

"It is shown in this record that Bridgewater had no privilege license to distribute gasoline and to do business in his own name. It is unlawful to operate oil depots and distributing trucks without a privilege license and the payment of a privilege tax. While the fact that the company had obtained a license and had paid the tax to be allowed to do business, is not conclusive, yet it is strong evidence that the parties intended to do what they were doing. It is highly improbable that a large company like the Gulf Refining Company with men of business experience would pay taxes and obtain a privilege license to do business in its own name, especially when it owned the business, unless it intended to operate that business. To say the least, all these facts and circumstances together with the contract under which the business was operated were sufficient to carry the question of whether Bridgewater was an independent contractor to the jury, under proper instructions.

"Evidence of giving of orders, that the master's name was on the wagon which the servant was driving, that the uniform and tools used by the alleged servant were marked with defendant's name, or his business cards were so marked, daily report sheets and payrolls in the name of the defendant. is admissible to show the relationship of master and servant. 39 C. J., 1357, sec. 1584.

" 'Although it has been held that the fact that by the contract of employment the employer foregoes the right of control does not make one who is otherwise a mere servant an independent contractor, it has, nevertheless, been very generally held that the right of control as to the mode of doing the work contracted for is the principal consideration in determining whether one employed is an independent contractor or a servant. It is not the fact of actual interference with the control but the right to interfere that makes the difference between the independent contractor and a servant or agent. If the employer has the right of control, it is immaterial whether he actually exercises it. A similar expression of the principle under consideration is that the test is whether the employee represents his employer as to the result of the work only or as to the means as well as the result. If the employee is merely subject to the control or direction of the owner or his agent as to the result to be obtained, he is an independent contractor. If the employee is subject to the control of the employer as to the means, he is not an independent contractor; and this is so, although the contractor hires and discharges employees and pays them out of money received from the contract, or although he receives a specified compensation for his services, not in the nature of wages.' 39 C. J., 1316-18, sec. 1518; 39 C. J., 35, sec. 4; Gulf Refining Company v. Huffman & Weakley, supra; McHarge v. Newcomer, 117 Tenn., 595, 100 S. W., 700, 9 L. R. A. (N. S.), 298.

" 'The power of the contractor to employ and discharge employees in the performance of the work is not alone sufficient to create the relation of independent contractor.' 39 C. J., 1323, sec. 1526; Finley v. Keisling, 151 Tenn., 464, 270 S. W., 629.

"The control of the premises by the employer taken in connection with other surrounding circumstances may be sufficient to establish that the person employed is a servant and not an independent contractor. 39 C. J., 1321, sec. 1522.

"If the employee is subject to the control of the employer as to the management and means of operating the business he is not an independent contractor; and this is so, although the contractor hires and discharges employees and pays them out of money received from the contract. 39 C. J., 1317-8, sec. 1518, 1321, sec. 1523; Finley v. Keisling, supra; Waldron v. Garland Pocahontas Coal Co., 89 W. Va., 426, 109 S. E., 729; Gulf Refining Company v. Huffman & Weakley, supra.

"The fact that the contract does not expressly provide for the employment of assistants is not controlling. The authority to employ assistants may be either express or implied; it may be implied from the nature of the work to be performed, from

the general course of conducting the business of the master by the servant, or from the circumstances of the particular case. 39 C. J., 1271, sec. 1458.

"'Authority to do a given act carries with it an implied authority to do those things necessary in order to accomplish the main end, and what is necessary must be determined in many cases by reference to the particular facts.' Mechem's Agency (1 Ed.), sec. 816; see also Mechem's Agency (2 Ed.), 715.

"It follows that we hold that the question of whether the Gulf Refining Company retained control of the business as principal and of whether Ingram was its agent, were questions of fact under the circumstances to be submitted to the jury, hence this assignment must be overruled."

We find that the facts disclosed by the evidence at the second trial were (insofar as they are material and determinative in the consideration of the assignment that there was no evidence to support the verdict) substantially the same as the facts appearing in the former opinion upon which this Court based its ruling that there was material evidence to support the verdict of the jury.

Where the issues and evidence are practically the same at a second trial of an action for personal injuries as at the first trial, the ruling on the first appeal that there was evidence for the jury on the question of defendant's negligence, and that there was no evidence of contributory negligence which as a matter of law contributed to the injury, is the law of the case. Mahany v. Kansas City Railway Co. (Mo.), 254 S. W., 16. 29 A. L. R., 817, 824; Noyes v. Des Moines Club, 186 Iowa, 378, 170 N. W., 461. 3 A. L. R., 605, 607; Fogarty v. Northern Pacific Railway Co., 85 Wash., 90, 147 Pac., 652. L. R. A., 1916-C, 803, 804; Gulf, etc., Railroad Co. v. Hardy, 151 Miss., 131, 117 So., 536, 61 A. L. R., 1073, 1075; Maryland Casualty Co. v. Maloney, 119 Ark., 434, 178 S. W., 387, L. R. A., 1916-A, 519, 521; Olson v. Carlson, 83 Wash., 415, 145 Pac., 237, L. R. A., 1915-F, 13, 14; White v. International Text Book Co., 156 Iowa, 210, 136 N. W., 121, 42 L. R. A. (N. S.), 346; Thaler v. Construction Co., 229 Pa., 512, 79 Atl., 147, 33 L. R. A. (N. S.), 345; Mutual Reserve Fund Life Association v. Ferrenbach, 144 Fed., 342, 7 L. R. A. (N. S.), 1163, 1166; 2 R. C. L., pp. 227-228, sec. 191; Gohman v. St. Bernard, 111 Ohio St., 716, 41 A. L. R., 1057, 1061.

Of course, the rule is otherwise if the evidence with respect to material and determinative facts is not the same at the last trial as at the first. U. S. Annuity & Life Insurance Co. v. Peak, 129 Ark., 43, 195 S. W., 392. 1 A. L. R., 1259, 1262.

But cumulative evidence does not take the case out of the rule. Noyes v. Des Moines Club, supra.

For the reasons stated, the first assignment of error is overruled.

The second assignment of the Gulf Refining Company and the thirteenth, fourteenth, fifteenth and sixteenth assignments of Bridgewater assert, in substance, that the trial court erred in admitting testimony of certain witnesses that Ingram said he was responsible for the collision because the brakes on the oil truck he was driving were defective and, therefore, would not hold.

These assignments are directed to certain testimony of the witnesses A. L. Frazier, Sellers Evans, Robert Helmantaller, Henry Lynch, J. L. McMillan and Joe Hawkins.

Evidence of similar purport was before the jury on the first trial, but its competency was not questioned on the appeal from the first judgment.

A decision on appeal as to the legal effect of evidence does not affect the power of the Court on a subsequent appeal to review the question of the admissibility of the evidence. Korab v. Chicago, etc , Railroad Co., 165 Iowa, 1, 146 N. W., 765; Anno. Cas., 1916-E, 637, 638.

The assignments challenging the admission of the evidence of the aforesaid statements of Ingram present a question of much importance in the decision of this case, for without this testimony there is no evidence to support the averments of plaintiff's declaration that "the brakes on defendant's car, even if they were applied, were in such defective condition as that they did not check the speed and serve to lessen the violence of the impact," and the averment of the declaration on this point is met by evidence on behalf of defendants that the defendant's truck was inspected by a competent mechanic shortly before and also shortly after the collision in question, and the brakes were in good condition and operating efficiently.

The testimony of plaintiff's witnesses with respect to Ingram's statements in question, together with objections and motions to exclude, and the ruling of the Court thereon, will appear from the following excerpts from the record, viz:

A. L. Frazier (witness for plaintiff):

"Q. Did this man in your presence, of course you were in the wreck, I know, but did this man, Ingram, say anything there about whether he was at fault or not? A. He just said it was his fault, and he couldn't help it, he didn't have any brakes, he couldn't stop. . . .

"Q. Did this oil truck head into that ditch or branch there? A. Yes, sir, it headed down in there.

"Q. About how far down did it go, down into the bottom? A. I suppose about as deep as it could go, I don't know.

"Q. About as deep as it could go—it was on the right side of the road, was it? A. Yes, sir.

"Q. The same side of the road you were on when you were hit? A. Yes, sir.

"Q. You spoke a while ago of what Ingram said, who was driving this oil truck, now when did that occur, that conversation you say he had about how it happened? A. As quick as I could get out of the car and ask who hit me.

"Q. About how long would you say it was? A. I couldn't say about how long it took me to get out of my Ford, and him to get out of the truck, it was about that long. He was up in the road.

"Q. Anybody else hear him make that statement? A. I don't know that they did right at the time, I heard two others heard him, yes.

"Q. That is what I say, you had just gotten out of the car you say when he made this statement; had he gotten out of the truck? A. Yes, he was coming up the bank, had got in the road I believe.

"Q. He had gotten out of his truck? A. Yes.

"Q. It was down in the ditch, and he had gotten out and come up on the road? A. That was where he was when I asked him, I made the remark, 'Who hit me?' And he answered . . .

"Mr. Finley:

"Now, may it please the Court, I want to except to all the statements made by the witness as to what Ingram said after this accident, and ask for it to be excluded from the jury, insofar as the defendant R. A. Bridgewater is concerned.

"The Court: I will reserve action on that exception until I hear more proof as to the condition that may have existed. Under some circumstances it would be competent and under other circumstances it would not be.

"Mr. Humphreys: But your Honor, under the circumstances that existed there at the time?

"The Court: It is not what he knew about the situation at the time, but the proof as to the relationship that may have existed between the parties.

"Mr. Humphreys: Your Honor please, it is cumulative, and we ask that it be stricken.

"The Court: I am reserving action under the exception until I find out more."

Sellers Evans (witness for plaintiff):

"Q. Did you hear Mr. Ingram make any statement? A. I heard him make some explanation about his brakes.

"Q. What did he say? A. I am not sure, it was wet or wouldn't hold one or the other.

"Q. One or the other? A. Yes, sir.

"Q. What did he say about whose fault it was? A. I don't know.

"Q. Was he explaining why he did it? A. Nothing only about his brakes wouldn't hold, something like that."

Robert Helmantaller (witness for plaintiff):

"Q. Did you see this man Ingram that was driving the truck? A. Yes sir, I did.

"Q. Did you hear him make a statement? A. Yes sir, he was talking to Mr. Frazier and said his brakes were wet and wouldn't hold.

"By Mr. Finley: We except to the statement on behalf of the defendant Bridgewater.

"The Court: Same action, I will reserve the ruling.

"A. He said his brakes were wet and wouldn't hold, he said he hated it but said my brakes was wet and wouldn't hold, he couldn't help it.

"Mr. Faulkner: Q. What did he say? A. He said he was responsible for the wreck.

"Q. What did he say caused it? A. Said his brakes wouldn't work.

"Q. That was Ingram? A. Yes, sir."

Joe Hawkins (witness for plaintiff):

"Q. Did you see the man Ingram, the defendant here, that was driving the truck? A. Yes, sir.

"Q. Did you hear him say as to how the accident happened? A. Yes, sir.

"Q. What did he say, Joe, just tell it?

"Mr. Humphreys: We object to that, Your Honor please, as to the other two defendants.

"The Court: Same action as heretofore.

"Mr. Finley: The Court reserves his action.

"The Court: Go ahead.

"Mr. Faulkner: Q. Yes? A. I came along there, we had been to take our children to school, and when we came back we discovered the wreck there and stopped and got out, and went around down there where the crowd was, and this truck driver was over here where the coal oil truck was down in the ditch, and I stopped and asked him what happened, and he said he ran into that little truck there and knocked it over there and the bus ran over it. And then I asked him, says well, how did the accident happen? Well he says, I was running along about seventy-five feet behind this fellow and he says when he slowed down to let the bus get across that bridge I couldn't stop, my brakes didn't hold and there wasn't nothing for me to do but just hit him. I said, why didn't you pull over into this bank instead of

hitting the truck, why didn't you pull into this bank? He said I didn't have time, and I thought every minute my brakes were going to hold, and said, I told them they ought to fix this truck, and I reckon they will fix it now. And my wife came right on through then in the car and said, let's go, and I got in the car, and that is all I know about it.

"Mr. Finley: Now, may it please the Court, we want to make ourselves clear on this exception. I understand Your Honor ruling heretofore, the point we make is that by no possibility could this be competent testimony, it is not part of the res gestae, and it does not make any difference about the question of agency, and this man could not bind anybody else connected with the matter; and we say to permit this to go on here from time to time, witness after witness being submitted to the jury, is an injustice to these defendants, because we conceive it to be absolutely incompetent and improper on any phase of the case.

"The Court: Let me see that contract that has been made a part of the record. (Passed to Court).

"The Court: Gentlemen, with reference to that matter that has been under consideration, the Court is constrained at this time to overrule the exceptions that have been made from time to time involving the question of agency as a matter of fact, statements of the defendant Ingram made at the time and subsequent to the accident, with reference to the cause of the accident, exceptions were made on numerous occasions heretofore by the defendants, action of the Court being reserved at the time, is now overruled.

"To which action of the Court the defendants Bridgewater and Gulf Refining Company then and there duly excepted."

As a part of his principal charge, and near the close thereof, the trial judge instructed the jury as follows:

"A matter is brought to my attention, gentlemen of the jury, as to which I should have charged you with reference to the admissibility of alleged statements said to have been made by the defendant Ingram, as against the defendant, Gulf Refining Company. The admissibility of those statements depends upon the question as to whether or not the defendant Bridgewater was an agent of the Gulf Refining Company or an independent contractor; that is a question that has been submitted to you as a question of fact. If you should find as a matter of fact that the defendant Bridgewater under whom Ingram was working directly, was an independent contractor, not subject to the control of the defendant Gulf Refining Company, then the statements made by the defendant Ingram who was under the employment of Bridgewater directly, would not be competent as

against the Gulf Refining Company. But, if he was the agent, Bridgewater was the agent, of the Gulf Refining Company, and Ingram was acting under him, as the agent of the Gulf Refining Company, then the statements made by Ingram with reference to the circumstances as to how the accident occurred, which have been admitted in proof would be competent, so far as the defendant Gulf Refining Company is concerned.''

The instruction just quoted is assigned as error by Gulf Refining Company and Bridgewater—by Gulf Refining Company as a part of its second assignment and by Bridgewater through his seventh assignment.

In his rulings challenged by the assignments we are now discussing, the learned trial judge fell into error. The admissibility of the aforesaid testimony with respect to statements of Ingram did not depend upon the fact of agency; that is to say, such evidence was inadmissible as against the Gulf Refining Company and Bridgewater, even though Ingram was the agent or servant of his co-defendants, unless the proof shows that Ingram's statements were a part of the res gestae. 2 Jones on Evidence (2 Ed.), sec. 944, p. 1745, and Vol. 3, sec. 1207, p. 2217.

There is a considerable diversity of opinion among the Courts of the several States with respect to the application of the res gestae rule. However, it is a general rule that (1) a declaration sought to be proved must have been contemporaneous with the event established as the principal act, and (2) a declaration which is merely a narrative of a past occurrence is not part of the res gestae and cannot be received in evidence. In the application of these rules to particular cases, the Courts have differed as to when a declaration is so far coincident in point of time with the principal fact as to fall within the contemplation of the general rule above stated.

In Tennessee, the Courts have adhered closely to the rule that declarations, in order to be evidence as a part of the res gestae, must be contemporaneous with the principal transaction of which they are a part. Denton v. State, 1 Swan, 278, 281; Street Railroad Co. v. Howard, 102 Tenn., 474, 478, 52 S. W., 864; Irvine v. State, 104 Tenn., 132, 138, 56 S. W., 845; Frank v. Wright, 140 Tenn., 535, 545, 205 S. W., 434; Tenn. Cent. Railway Co. v. Gleaves, 2 Tenn. App., 549.

In the last-cited opinion, the Tennessee cases and numerous other authorities are reviewed, and the rule is there reaffirmed that declarations, in order to be admitted as a part of the res gestae, must be contemporaneous with the principal transaction of which they are a part; that the declarations are evidence because they are a part of the thing doing, and, therefore, if the thing shall have been done and concluded, declarations then made are not evidence.

In 3 Jones on Evidence (2 Ed.), sec. 1198, p. 2200, the view expressed by some courts that the end of the principal transaction is the time "when excitement has subsided and premeditation of act or statement may be suspected," is disapproved by the author, and he there approves the statement that "expressions of persons who are actors, made during the occurrence, may generally, but not always, be proved. If spontaneous, and caused by the event, they may nearly always be shown. But if afterwards, no matter how shortly afterwards, there is an attempt to explain what has happened, or to account for it, or to defend one's self, or the like, it is incompetent, and inadmissible as res gestae."

The statement just quoted is in line with the rule approved by our Supreme Court that "in each case such declarations must be excluded if they do not tend to give character to a contemporaneous act, and are merely narrative, however nearly connected in time they may be with the main fact in controversy.". (Street Railroad Co. v. Howard, supra, p. 482).

In connection with the citation of Tennessee cases it may be well to correct a misapprehension on the part of counsel for plaintiff with respect to the holding of this Court in the case of Elkin Motor Company v. Ragland, decided October 1, 1927.

In the printed brief of learned counsel for plaintiff Frazier it is said:

"In the unreported case of Ragland v. Elkin Motor Company, Wilson Law, opinion by Justice Faw, I think, singular to say, the Company's driver was a Mr. Ingram. Ingram went to sleep on the way between Lebanon and Watertown, while in charge of the company's car. Ingram's wife was driving, when they collided with a car driven by Ragland. In that case like this case, Ingram was made a party defendant. The trial judge allowed the plaintiff to prove that directly after the accident, some parties drove up and said what has happened here, to which Ingram, in substance, replied:

" 'I went to sleep and my wife who is not a good driver, driving the car ran our car into the car of these gentlemen and turned it over.'

"Exception was taken to the introduction of this proof, but this Court sustained the action of the trial judge.

"It may be noted in this connection, that, in that case they placed Ingram upon the stand and in that case, as in this case, my recollection is he did not deny having made the statement."

Counsel has overlooked the fact that the case to which reference is thus made is reported in 6 Tennessee Appeals Reports, pages 166 et seq. (sub nom Elkin Motor Company v. Ragland). All that is said in that opinion with reference to statements of Ingram is as follows:

"Defendant's fifth assignment is that 'the court erred in over-ruling the defendant's exception to testimony of Mr. Ingram that the accident was his wife's fault, when it is admitted that he was asleep at the time the accident occurred.'

"There is no citation to a page or pages of the record where such testimony as that mentioned in the fifth assignment, supra, may be found.

"This assignment does not comply with the rules of this court and of the Supreme Court, which requires that 'when the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected, with citation of record where the evidence and ruling may be found.' See Appendix to 1 Tenn. App., 3; 151 Tenn., 815. The Supreme Court has the same rule. See 126 Tenn., 722.

"In the written argument of defendant's counsel, filed along with the assignment of errors, it is said (under the head of 'Assignment V') that 'this assignment is based on testimony that was given by J. H. Ragland over the objection of the defendant, as follows:

"'Q. What did Ingram say? A. Well he said it was all his fault and he would go and get the wrecker and bring it down there and carry the car back and have it fixed up and they would have no trouble about it.

"'Q. He said it was all his fault? A. Yes sir.'

"It is seen that the testimony thus cited cannot be the testimony referred to in the fifth assignment of error, because the assignment complains of the admission of testimony of Mr. Ingram that the accident was his wife's fault, and the testimony which counsel quotes as supporting the fifth assignment is testimony of J. H. Ragland that Ingram said 'it was all his fault.' The court is therefore confronted with the precise situation which the rules above quoted were designed to prevent. The fifth assignment will be disregarded because it does not constitute a valid assignment of error."

It is thus seen that in Elkin Motor Company v. Ragland, this court made no ruling upon the admissibility of testimony relating to Ingram's statements, for the reason that the question was not presented by a valid assignment of error.

The counsel for Frazier in the instant case represented Ragland, the original plaintiff in the case from which we have just quoted, and doubtless the statement quoted above from his brief was made from memory, which, after the lapse of almost five years, failed to recall accurately the ground on which the fifth assignment of error in the Ragland case was overruled.

In the present case, the refusal of the trial court to exclude the testimony of Sellers Evans, Robert Helmantaller and Henry Lynch (which testimony we have heretofore quoted) with respect to declarations of Ingram, although technical error, was harmless, and therefore not reversible error, for the reason that they merely testified Ingram said his brakes were wet and would not hold. Ingram (who was a witness for himself and his co-defendants) testified that his failure to stop the truck he was driving in time to prevent the collision was because his brakes would not hold, and that the failure of his brakes to hold was due to the fact that they were wet; that his brakes were in good condition and held all right at the time he left the "plant" at Lebanon on the morning in question, but that it was raining on the way out to the scene of the collision (about seven miles) and his brakes became wet.

For the reasons just stated, the assignments of error complaining of the admission of the quoted testimony of Sellers Evans, Robert Helmantaller and Henry Lynch are overruled.

But the testimony of A. L. Frazier that Ingram said it was his fault, that he didn't have any brakes; the statement of J. L. McMillan that Ingram said he was responsible for the wreck; and the statement of Joe Hawkins that Ingram said, "I told them they ought to fix this truck, and I reckon they will fix it now," were clearly prejudicial to the Gulf Refining Company and Bridgewater, and we are of the opinion that the declarations thus ascribed by these witnesses to Ingram were not a part of the res gestae, but were mere narrative statements, made in response to questions, by which statements Ingram was attempting to explain and account for a collision that had theretofore happened and ended. The second assignment of the Gulf Refining Company and the seventh, fourteenth, fifteenth and sixteenth assignments of R. A. Bridgewater are sustained.

The assignments of error thus sustained are not available to defendant Ingram, as it was competent for the plaintiff to prove Ingram's admissions against his interest. 2 Jones on Evidence (2 Ed.), sec. 901, pp. 1650-1651.

Through its third assignment of error the Gulf Refining Company asserts that the trial judge erred in his instructions to the jury with reference to the question of whether Bridgewater and Ingram were the agents of the Gulf Refining Company. This assignment is predicated upon certain specified excerpts from the charge as follows:

(a) "If, on the other hand, however, gentlemen of the jury, he had a contract with the Gulf Refining Company whereby he undertook to transact certain business for them wholly or in part under the direction of the Gulf Refining Company, the Gulf Refining Company retaining the right, whether it exercised it or not, to direct him wholly or in part, and to control him

wholly or in part in the exercise of the functions that he undertook to perform, he would then be an agent rather than an independent contractor.

(b) "The plaintiff says that the defendant Bridgewater although an agent of the Gulf Refining Company, did have a financial interest in the business in that his compensation was derived from commissions upon sales and that his compensation or his earnings or his income from the business was dependent upon the extent of the business, and to that extent he was interested in the business, although only an agent under the law of the defendant Gulf Refining Company. You will determine how that was.

"As to the liability of the defendant, Gulf Refining Company, coming back to the starting place again; if you have found Ingram liable, if you now find that the defendant Bridgewater was an independent contractor, and that the Gulf Refining Company had no control over him, and that he was responsible only for the end results and that it could not control him, or supervise the business or have any control over it, whether it did so or not, then the Gulf Refining Company would not be liable.

"But, if you should find from the proof that he was an agent of the Gulf Refining Company, and that this transaction was had in the pursuit of his agency, through the activity of his employee, Ingram, and that he was interested in the business even though he was not present, the Gulf Refining Company would be liable for the negligence of its agents."

This assignment purports to be further based upon ground No. 37 of the Gulf Refining Company's motion for a new trial below, but the record shows that ground No. 37 "was stricken from the bill of exceptions."

The above quoted instruction that if Bridgewater had a contract with the Gulf Refining Company whereby he (Bridgewater) undertook to transact certain business for said Company "wholly or in part under the direction of the Gulf Refining Company, the Gulf Refining Company retaining the right, whether it exercised it or not, to direct him, wholly or in part, in the exercise of the functions he undertook to perform, he would then be an agent rather than an independent contractor," was, in our opinion, erroneous, and was misleading to the jury upon a vital point in the case.

As we understand the record, the Gulf Refining Company has not controverted the fact that, at the time in question, it had a contract with Bridgewater whereby the latter undertook to transact certain business "in part under the direction of the Gulf Refining Company," but that it is, and was at the trial below, the contention of the Gulf Refining Company that, in the performance of his said con-

tract, Bridgewater was not "wholly," but only "in part under the direction of the Gulf Refining Company," and that the Company had no right to control the manner in which he should make deliveries of oils, gasoline and kerosene; that, with respect to that part of the business, he was an independent contractor. Such was the theory of the Gulf Refining Company at the trial below, and as there was, to say the least, some material evidence to support it, the Refining Company was entitled to have its theory fairly submitted to the jury.

In 14 R. C. L., 76, it is said: "While in all ordinary transactions the existence of the relation of contractor as between the two given persons excludes that of principal and agent, or master and servant, there is not necessarily such a repugnance between them that they cannot exist together, and an employee may be an independent contractor as to certain work and yet be a mere servant as to other work for the same employer."

And a number of cases are cited in support of the same proposition in a note found in 19 Anno. Cas., 7.

In the leading case of Powell v. Construction Co., 88 Tenn., 692, 697, 13 S. W., 691, the Court (speaking through Mr. Justice Lurton) quoted with approval from Thompson on Negligence, as follows:

"In every case the decisive question is, had the defendant the right to control in the given particular the conduct of the person doing the wrong." (Reaffirmed, 155 Tenn., 582, 297 S. W., 201.)

The "given particular" in the instant case was the maintenance, repair and operation of the truck which inflicted the injury upon the plaintiff, and the right to control the driver of the truck.

The jury might readily understand from the second of the two excerpts last above quoted from the charge that the Gulf Refining Company would be liable for negligence of Ingram and/or Bridgewater, if Bridgewater had "a financial interest in the business, in that, his compensation was derived from commissions upon sales and that his compensation or his earnings or his income from the business was dependent upon the extent of the business." This was error, and, upon the undisputed facts of this case, it was practically a peremptory instruction against the Gulf Refining Company, in the event the jury should find Bridgewater and/or Ingram guilty of actionable negligence. 14 R. C. L., 76-77; Note 17 L. R. A. (N. S.), 382; Note 19 Anno. Cas., 7.

The third assignment of error of the Gulf Refining Company is sustained.

The fourth assignment of the Gulf Refining Company and the second assignment of Bridgewater and Ingram are the same. The substance of these assignments is that the trial court erred in permitting Dr. Doak, a medical witness for plaintiff, to place the minor plaintiff (an intelligent boy about ten years of age) on a table in

the presence of the jury and, after removing his pants, have him to make various demonstrations with his legs and feet and answer questions put to him by the witness (Dr. Doak) explaining his claimed inability to make certain movements with his limbs, although the plaintiff was at no time sworn or introduced as a witness in the case.

In order that the complaint made through these assignments may be better understood, we quote from the testimony of Dr. Doak as follows:

"Q. Doctor, could you explain it to us better if you had the little boy? A. Yes sir.

"Mr. Faulkner: Let the little boy come around.

"(Plaintiff brought around.)

"Q. Now I want you to take the little boy here and I want you to show the Honorable Court and Jury just what condition this boy is in and all the injury he received and the result of it and how it affects him, Dr. Doak? A. I will have to have a table, if they will clear that table.

"Mr. Humphreys: I want to ask this question. Does the plaintiff acquiesce and join in this examination, I want that question answered and made a part of the record?

"The Court: The plaintiff being a child, it appears he sues by his next friend.

"Mr. Humphreys: We would ask if his father acquiesces?

"The Court: Evidently he does, as it is being done by his instance.

"(Plaintiff put on the table his pants removed.)

"A. Now it was his left hip that was hurt.

"Mr. Faulkner: Talk so the jury can hear you. A. The bruises are in this shape, coming down on his leg here, which stayed very black for several days and began to fade out and turned green as bruises do after a while that entirely disappeared some time after the injury, in fact in about February, 1930, I was coming down the road and saw the little fellow coming across the brow of the hill. I knew he was carrying a bucket of eggs, he and his little brother. I noticed him walking with his foot this way. I remarked to his father a few days after that, Victor was limping.

"Q. Called his father's attention? A. Yes sir, told him that Victor was limping.

"Q. Don't tell the conversation? A. I found his toe turned out and he was limping, then I put him under another examination, I put this test to him. Work them that way, work out now, now work this one the same way. Now turn it back. Now work it, you can't, why can't you?

"(The Plaintiff:) It hurts.

"A. Now work it. Now turn over on your stomach.

"Mr. Finley: Now, may it please the Court, in order that the defendants I represent may preserve their rights, Bridgewater and Ingram, I want to expressly except to this demonstration here in the presence of the jury, because as a matter of law we insist this is highly improper and prejudicial to the rights of these defendants.

"The Court: Does the other defendant join in that exception?

"Mr. Humphreys: Yes, Your Honor.

"The Court: Let the exceptions be overruled.

"To which action of the Court the defendants and each of them then and there duly excepted.

"Mr. Faulkner: O. Now Doctor Doak, you can try to go ahead again. A. Kick this foot up here, keep it up, three or four times. Now kick the other one up, let it down, kick it up hard and quick, now the other one, quick. All right, sir.

"(Plaintiff stands up on table.)

"Swing this foot away out this way as far as you can, that is right. Now swing this one out as far as you can. That is all right. Throw this one forward. Now swing the other one. Now back. That is all right.

"Now may it please Your Honor, the best demonstration is climbing up and down steps, we have none in here, and they excepted to my demonstration.

"Mr. Finley: We are excepting, Your Honor, to the remarks made by this witness in the presence of the jury.

"The Court: I think there is nothing prejudicial or improper in the statement of the physician.

"To which action of the Court the defendants and each of them then and there duly excepted.

"Mr. Faulkner: Q. I will ask you Dr. Doak, if you have observed him in climbing steps or not? A. Yes sir.

"Q. Did you observe the child at times he didn't know anybody was observing him? A. That was how come me to catch it, I was watching him.

"Q. Tell His Honor the Court and the honorable jury how it affects him, how does he do in getting up and down steps? A. Goes up a step with his right foot as I did, he draws the other foot like that. We asked him to put it up on the other step and it hangs under or on the step.

"Mr. Finley: We are excepting to that. I am renewing my exception to the demonstration made in the presence of the jury.

"The Court: Overruled.

"To which action of the Court the defendants and each of them then and there duly excepted."

In 22 C. J., at page 789, it is said: "A practical illustration of the physical condition of an injured person may be given before the jury, unless the alleged injuries are not visible, in which case the danger of simulation may be sufficient reason for excluding the evidence."

The alleged injuries of the plaintiff in the instant case were not visible to the eyes of the jurors. Dr. Doak testified that there were no bruises, wounds or marks of any kind on the plaintiff's person at the time of the trial. The trial now under review was had approximately two years after the collision here involved, and during the intervening period the plaintiff had been repeatedly examined by several different physicians, including Dr. Doak, who was the "family physician" of plaintiff's father and was called to attend the plaintiff immediately after he was injured. There is nothing in the record from which we could infer, and there is no good reason to assume, that the plaintiff did not have a fairly intelligent understanding of the claims made in his behalf with respect to the manner in which, and the extent to which, his injuries had affected his normal muscular powers. Obviously the demonstration permitted in this instance afforded an opportunity (and a strong temptation) for simulation by the plaintiff, without the opportunity for cross-examination on behalf of the defendants.

As said by the Court of Appeals of Missouri in the case of Willis v. City of Browning, 143 S. W., 516, 517, "Would it be allowable to strike a sensitive wound, in order that the jury might hear the plaintiff scream with pain? What restraint would there be on opportunity for simulated evidence?"

In the case of Landro v. Great Northern Railway Co., 117 Minn., 306, 135 N. W., 991, Anno. Cas., 1913D, 244, it is said:

"It is within the discretion of the trial court to permit a plaintiff in a personal injury case to exhibit his injuries to the jury, in order to show their extent or to enable a surgeon to demonstrate their nature and character. Hatfield v. St. Paul, etc., R. Co., 33 Minn., 130, 22 N. W., 176, 53 Am. Rep., 14; Clay v. Chicago, etc., R. Co., 104 Minn., 1, 115 N. W., 949. It is also discretionary to permit tests and experiments in the presence of the jury in a proper case and under proper safeguards. But where there are no wounds, no injuries that can be seen by the jury, it is improper to permit the exhibition of plaintiff's person for the purpose of conducting experiments to prove that he will cry out with pain, or that his muscles will grow rigid when his legs are manipulated in a certain manner."

And so, in the instant case, we are of the opinion that it was improper to permit the exhibition of plaintiff's person before the jury for the purpose of showing, by the voluntary movements of his limbs and by his response to a question asked by Dr. Doak, the way and manner in which and the extent to which he could move his legs and feet without pain—the plaintiff not being sworn as a witness and the defendants having no opportunity to cross-examine him.

It is true that in the case of Packet Co. v. Hobbs, 105 Tenn., 29, 58 S. W., 278, the Supreme Court overruled an assignment of error through which the plaintiff Packet Company complained of the action of the trial court in permitting Hobbs (the plaintiff below) to display and exercise his injured leg before the jury. In the opinion in that case the Court said:

"The ascertainment of truth is the true and ultimate object of every judicial inquiry; and, as a general rule, all evidence is competent which, according to the nature of the fact whose truth is submitted to investigation, may fairly and reasonably facilitate that object.

"The particular matter for whose elucidation the testimony now in question was introduced was the extent of the plaintiff's injuries. That was the matter under investigation at that stage of the trial, and the jury, whose peculiar province and duty it was to ascertain the same, was, therefore, entitled to the advantage of all available information calculated in its nature to facilitate the ascertainment of the real truth.

"How could that investigation have been better promoted, and the attainment of that end better secured than by the course adopted in this instance, with the privilege of all legitimate cross-examination of the adverse party?

"In reality the method was a superior one; and, as a result, it produced a higher order of evidence than is usually attainable, in that it added physical illustration and demonstration to oral statement, and impressed the Court and jury through the sense of sight as well as through that of hearing.

"It may be true that a designing witness can exaggerate the true condition of an injured limb by false and constrained movements, and yet that cannot render the performance of physical acts inadmissible as evidence any more than the equally obvious fact that he may given undue and false coloring to his oral statements, renders him incompetent to testify by word of mouth. That objection might be urged against all human testimony, but it goes only to the question of weight or credibility, and does not reach that of competency or admissibility."

It is seen that in the above quotation the Court expressly predicated the admission of such evidence upon the condition that the de-

fendant had "the privilege of all legitimate cross-examination of the adverse party," which the defendants in the instant case did not have. This affords a marked distinction between the two cases and, we think, renders the former case inapplicable as authority in the present case. If Hobbs had not been introduced as a witness, subject to cross-examination, but had exhibited and manipulated his injured limb before the jury in response to suggestions by a medical witness and had stated that he could not move his leg further in a certain direction because "it hurts," we apprehend that such procedure would have been held erroneous.

There is nothing in this record which shows, or from which it could be reasonably inferred, that the plaintiff was not mentally competent to testify at the time of the second trial of this case. He was about ten years of age at that time and "there is no precise age within which witnesses are absolutely excluded upon the presumption that they have not sufficient understanding to testify." Vincent v. State, 3 Heisk., 120, 121.

In Logston v. State, 3 Heisk., 414-419, it was held that a child eight years of age was properly admitted as a witness; and in 5 Jones on Evidence (2 Ed.), sec. 2106, p. 3956, it is said that "there are instances on record in which the testimony of children of five and six years of age has been received; and it is common practice to admit the testimony of children eight or nine years of age where they seem to understand the obligation of an oath." In the instant case, there was no effort to make a preliminary examination of the plaintiff in order to ascertain his comprehension of the nature of an oath or of his duty to tell the truth.

We do not wish to be understood as suggesting that there is anything in this record which indicates that there was an effort on the part of the plaintiff below to simulate injuries or conditions which did not exist, or that anyone connected with the case entertained a purpose to have him do so; but the rule excluding such evidence is, we think, based upon sound reason, and it must apply to all cases alike. "The danger is, that a wrong principle established to accomplish what seems to be right in one case, may defeat right and justice in another. All cases, therefore, must be governed by the same general rules and principles." Marr v. Marr, 2 Head, 303, 312; Growers Warehousing Corporation v. Sawyer Tobacco Co., 5 Tenn. App., 619, 630. The fourth assignment of the Gulf Refining Company and the second assignment of Bridgewater and Ingram are sustained.

The Gulf Refining Company's fifth assignment of error is, in substance, that the trial court erred in permitting Dr. Young and Dr. Loring, witnesses for plaintiff, to testify over defendants' objection, as to the physical condition of plaintiff, basing the opinions in part on subjective testimony derived from statements to them of plaintiff and of Dr. Doak and of plaintiff's parents.

The fourth and fifth assignments of Bridgewater and Ingram are, in effect, the same as the fifth assignment of the Gulf Refining Company, supra; and the third assignment of Bridgewater and Ingram is based on the action of the trial court overruling similar objections to testimony of Dr. Doak.

It is the general rule that "a medical observer must base his opinion upon objective rather than subjective symptoms." 22 C. J., 670.

"Objective symptoms are those which the surgeon discovers from a physical examination of his patient; subjective symptoms are those he learns from what his patient tells him." Dean v. Wabash Railroad Co., 229 Mo., 425, 442, 129 S. W., 953.

However, the rule excluding the opinion of a physician or surgeon based on subjective symptoms of the patient is applied more strictly to testimony of one who examines the patient for the purpose of qualifying himself to testify as a witness than to testimony of an attending physican who examines the patient for the purpose of giving him medical treatment or professional advice. C. & O. Railway Co. v. Wiley (Ky.), 121 S. W., 402, 409.

"Where it appears that the physician testifying was called by the injured person in his ordinary professional capacity and for purposes of securing relief from pain and for medical treatment, and there are no circumstances casting suspicion on the genuineness of the utterances, all statements of symptoms and sufferings, whether past or present, and though involving statements as to the nature of the accident, if necessary to diagnosis by the physician, may be testified to by him. On the other hand, where a physician examines an injured person for the express purpose of testifying as to his physical condition, even declarations of present pain made by the patient to the physician have been held inadmissible." 3 Jones on Evidence (2 Ed.), sec. 1217, pp. 2234-2235.

But aside from statements of a patient to his attending physician as indicated above, the general rule excluding hearsay testimony finds no exception in the case of medical experts, and, although the opinions of such witnesses may be based upon personal knowledge gained from observation or examination, "the rule is well established that hearsay in the form of information gained from the statements of others outside the courtroom is not such personal knowledge, nor may it be the basis of an expert opinion. Thus, when a medical witness is examined as an expert, his opinion is inadmissible if based upon declarations of nurses or other physicians, made out of court." Idem, sec. 1335, pp. 2442-2443. See also Lee v. Kansas City Southern Railway Co., 206 Fed., 765, 771; 22 C. J., 670-671.

With the foregoing rules in mind, we have examined the testimony of Dr. J. R. Doak, Dr. C. A. Loring and Dr. C. V. Young.

The third assignment of Bridgewater and Ingram, which is based upon objections to the testimony of Dr. Doak, is overruled. As be-

fore stated, Dr. Doak was the family physician of plaintiff's father and was plaintiff's attending physician, whenever he needed medical treatment or advice, from the hour of the collision here involved to the time of the trial. It is true that Dr. Doak had made some examinations of plaintiff recently before the second trial of this case for the purpose of further qualifying himself to testify as a witness, but we do not think it appears that in the course of such examinations he learned anything from statements then made by plaintiff or others that he did not already know from his previous observations and examinations in the course of his professional treatment of plaintiff.

Dr. Loring examined plaintiff on two occasions—first a year or more before the trial and again a few weeks before the trial—the first examination being made at the home of plaintiff's father and the second at the office of Dr. Young in Lebanon. Neither of these examinations was made for the purpose of professional treatment or advice, but in order to qualify Dr. Loring to testify at the trial of this case.

Dr. Loring was questioned, on cross-examination, concerning the basis of the opinion expressed by him in his testimony, and we quote from his cross-examination as follows:

"Q. You don't know anything about the injury or accident except what he told you, the boy's father, do you? A. No sir.

"Q. And you base your opinion on what the boy's father told you at that time? A. I based my opinion at that time on what I saw of the boy.

"Q. Did the father give you a history of the case? A. Yes, he told me something about it.

"Q. Did you base your opinion partly on that? A. Yes sir, I based my opinion partly on that, what he said, and I examined him and found it to be like he said you know.

"Q. All right, the second time you examined him here in Lebanon, you made the examination in the presence of Dr. Young and Dr. Doak; did they tell you anything about what they had done or what they found? A. No sir, you want me to tell you what they said?

"Q. I am not asking you what they said, or what they told you? A. Just one thing one of them, I don't know which one, about the leg being a different size from the other, and is adducted when it ought not to adduct.

"Q. They told about that? A. Yes, but anybody could see that, Mister.

"Q. They told you, though, and Dr. Doak told you about the history of the case and about rendering first aid, and treating the boy, told you what he found? A. No sir, he didn't tell me he found anything at the store.

"Q. What is that? A. He didn't tell me that he found anything at the store, Mr. Frazier thought the boy was wrong trying to work, walking on his knees trying to work, I forget what he was trying to work at.

"Q. That was Mr. Frazier? A. No, Dr. Doak told that.

"Q. This second time then you based your conclusion on what these doctors told Mr. Frazier, what the doctors and Mr. Frazier told you, in part? A. No, I don't. I base it on what the doctor said in part.

"Q. That is what I said? A. Really no more than what you would have, if he had fixed it.

"Q. You base your opinion at the last examination in part on what Dr. Doak and Dr. Young told you? A. I did in part, if I hadn't found it to exist I would not have at all.

"Q. And that was in the presence of Dr. Young, Dr. Doak and the boy's father—did you base your findings three weeks ago to any extent on what Mr. Frazier told you happened in the interim? A. No, I don't base that on what he said because I did not feel that he knew enough about it.

"Q. Did you base it on what Dr. Young and Dr. Doak said there? A. I based it to some extent on what Dr. Young said there.

"Q. You did base it to some extent on what Dr. Young said at that time? A. To some extent, and found the pathology existing to correspond with what was present."

It is seen that, according to Dr. Loring's testimony, his opinion was based in part upon what Dr. Doak and Dr. Young had told him, including a circumstance (about plaintiff "walking on his knees, trying to work") which Dr. Doak had learned from statements made to him by plaintiff's father. It is impossible to determine the extent or degree to which Dr. Loring's opinion was thus based upon hearsay evidence, and it follows that his testimony was inadmissible and it was error to permit it to go to the jury.

Plaintiff's witness, Dr. C. V. Young, examined plaintiff "about four times" before he testified at the trial now under review—the last of these examinations being about two weeks before the trial—and each of these examinations was made at the request of counsel in this case—some, and possibly all, being made at the request of defendants' counsel. Dr. Young testified that these examinations were not made with the idea of treating the plaintiff, but with the purpose and intention of testifying as to plaintiff's condition.

Upon objection by defendants to any testimony from Dr. Young "not wholly objective," the witness was interrogated with reference to the basis of his opinion, and we quote his testimony delivered in the absence of the jury, together with the ruling of the Court upon the objection, as follows:

692

"Q. Dr. Young, in making your diagnosis of the case, you were governed practically by the history of the case which was given you by Dr. Doak, is that right? A. There were no symptoms to what Doak testified to at all, all that fullness had passed off, I went solely on what I found in examining the muscles.

"Q. Didn't he tell you the history of the case? A. He told me how the boy got hurt, yes.

"Q. Didn't he tell you the symptoms he has observed? A. I don't remember about that. I know we differed on thinking about these little adductor muscles being lacerated, I thought they were and he thought the trouble was over here, and it turned out we were both wrong, it wasn't a muscular condition.

"Mr. Faulkner: What you got, did you get from Doak or from your examination? A. I got it from my actual examination, and to my great surprise—

"Mr. Humphreys: Q. But you talked to the parents and learned of certain facts? A. I have never talked to anybody but Squire Frazier and very little to him.

"Q. Dr. Young, the diagnosis you make of this case is controlled partly by the actions of this plaintiff, aren't they, by his action in raising and lowering his leg? A. No sir.

"Q. And his actions either voluntary or involuntary? A. It is by watching the adduction of the foot, the crippled condition it is in, of course.

"Q. Then you do say that the observation of the phenomena you really had to go upon was gained from actions either voluntary or involuntary, under the direction of the plaintiff? A. Yes, I had him to take exercises, to move the foot.

"Q. And you asked him about the pain, tested him in various ways, asked him about the pain, and he told you about those matters? A. Yes sir.

"Q. From these facts you gained in that manner, you are able to testify now as to your opinion on whether or not he is injured and to what extent? A. Yes.

"Mr. Faulkner: Could here be a possibility—

"Mr. Humphreys: Your Honor please, we want to object to the manner of cross-examination, could there be a possibility.

"Mr. Faulkner: The jury is not here.

"Q. Could there be or could there not be a possibility of simulation in this grating of the bones? A. Oh. no.

"Q. Could that be put on at all? A. No sir.

"The Court: With reference to the matter of self-serving declarations that has been brought forward in the exception, I think that the age of this plaintiff excludes that particular consideration.

"The Witness: To a great extent.

"The Court: He was only around eight years old when the first examination was made, and he is only ten now, he is not of such age as he would be capable of making self-serving declarations.

"Mr. Humphreys: He is about ten, but in view of his youth and impressionability, not purposely would he simulate, simulation would not be manifested purposely, but he is continually reminded of the existence of the injuries, and in view of his youth it is possible and highly probable that he would simulate the injuries.

"The Court: I don't think there has been, any proof by any medical man who has been on the stand so far derived from anything that might be characterized as a self-serving declaration on the part of this plaintiff, in view of his extreme youth.

"To which action of the Court the defendants and each of them then and there duly excepted."

It is seen that, according to Dr. Young's testimony, he found by his examination a crepitation, or "grating of the bones," in plaintiff's hip joint, which, he said, could not be simulated. It is obvious, therefore, that this witness was able to testify from "wholly objective symptoms" that plaintiff was in an injured condition and the nature and character of the injury which the witness had discovered.

It is true that Dr. Young stated that he had plaintiff "to take exercises, to move the foot," and that, in response to questions, plaintiff had told witness "about the pain," but when Dr. Young's testimony before the jury is analyzed, we think it is evident that he based the opinion he expressed in that testimony entirely upon the "crepitation" or "bone roughness" which he discovered by his examination, wholly independent of "subjective symptoms" of the plaintiff or hearsay. We think this conclusion is manifest from the testimony of Dr. Young before the jury, which we quote as follows:

"Q. Doctor Young, you have stated that you examined this little boy three or four times? A. Yes.

"Q. I will get you to state to the Court and jury what you actually found, the actual condition of him, and his condition now, and what it will likely terminate in? A. Well anatomically his condition is a whole lot better.

"Q. The what kind? A. Anatomically, his muscles.

"Q. Tom what? A. Anatomically.

"Q. Go ahead? A. The anatomy of his muscles, the condition of his muscles is better, and the leg was smaller here at least nearly an inch several months ago, now it is the same size, and this condition in his groin that I was certain was a laceration of those little adductor muscles that attach across there

which holds the leg from going out, this seems to be normal and I couldn't understand him limping more, but finally in making the examination, the trouble is in the joint.

"Q. What do you mean by being in the joint? A. Where the femur here, where that goes into the joint, there is a fracture there, and after it goes in then the ligaments come across there and kind of ties it, sometimes it is overlooked by the best surgeons, and finally if it begins to break down and break loose, it shows up.

"Q. Dr. Young, of course this boy lying so as to have that hip taken I take it in other words? A. Yes, sir, left hip.

"Q. The left hip here must have been standing this way, then that is the left hip? A. Yes.

"Q. And here is the original work you are talking about. ·

"Mr. Finley: He might tell so as the stenographer can get what he is showing the doctor there.

"Mr. Faulkner: Q. I am showing to him here two photostatics purporting to be of the original of the boy's body where you are describing the ailment, I am trying to hold it for you between the jury and the light so that you and the members of the jury can see it; will you please point out the direct locality where this ailment exists? A. If this is the left hip it is right there. I never did find anything wrong with that picture, I am just showing you the anatomy, never found anything wrong with it after it was made, never found anything wrong until I found this crepitation.

"Q. What do you mean by crepitation? A. Bones roughness.

"Q. When Dr. Doak and this old gentleman from Smithville examined him the other day was the first time—what is that? A. The bones rubbing against the other.

"Q. What caused that? A. This injury, it is a fracture of that cap.

"Q. What do you mean by fracture? A. Break.

"Q. Cracked? A. Yes, cracked.

"Q. Is there anyway to mend that? A. None in the world. That kind of a fracture, it is mended but if it is in this intercapsulary at this boy's age it may proceed to grow worse and may make him a very bad cripple, and it may get to the point of filling in and not cripple him, not a man in the world can tell about that.

"Q. Will it ever get well? A. I don't think it will, and with the thing increasing, his general symptoms, muscles filling out and everything looking better so as far as you feeling around his leg is concerned, and yet his disability greater and his walking worse, it is reasonable that he has got trouble in that joint. Right here the other day, I examined him before the Court, I

was never more surprised when I put my hand around his hip and found that knot smaller, I thought it was going to be smaller, and now it is fully as large as the other one and yet his disability growing, and his trouble as sure as you are born is in that hip.

"Q. What would cause that? What would a fearful lick like being thrown suddenly and with violence across a highway and landing on a hard surface? A. I expect that would cause it.

"Q. Could that cause an accident of that kind? A. It could do it.

"Q. It is a result of trauma? A. Trauma, but sometimes it does not take very much trauma.

"Q. Suppose when he gets older and gets more weight upon him, what will the effect of that be? A. It is hard to tell, General, the tissues might fill in and be better.

"Q. Will it ever get well? A. I don't think it will ever get well. In my opinion it will get worse. In my opinion in a few years he will be badly crippled, that is my honest opinion.

"Q. Just one other thing there, talking about walking, working it, did you put any other test of working it yourself A. Yes.

"Q. Was it normal or not? A. No, you can feel the bones, the rough grating of the bone, that you couldn't play."

It follows from what we have said that the Gulf Refining Company's fifth assignment is sustained, insofar as it asserts error in the admission of the testimony of Dr. Loring, but overruled insofar as it asserts error in the admission of the testimony of Dr. Young, although we do not hold Dr. Young's testimony competent upon the ground stated by the trial judge, viz: the "extreme youth" of the plaintiff.

Also that the fourth assignment of Bridgewater and Ingram, which challenges the competency of Dr. Young's testimony, is overruled, and the fifth assignment of Bridgewater and Ingram, which complains of the admission of Dr. Loring's testimony, is sustained.

The Gulf Refining Company's sixth assignment and the nineteenth assignment of Bridgewater and Ingram are that the verdict of the jury is so excessive as to evince passion, prejudice and caprice.

As the case must be remanded for a new trial, the consideration of this assignment is pretermitted.

Through the seventh assignment of the Gulf Refining Company and the seventeenth and eighteenth assignments of Bridgewater and Ingram, the defendants complain of specified parts of the arguments of plaintiff's counsel to the jury, which arguments, defendants assert, were improper and were prejudicial to the defendants. The seventeenth assignment of Bridgewater and Ingram is directed to certain parts of the argument of Mr. Turner, and the eighteenth assignment of Bridgewater and Ingram relates to portions of the argument of Gen. Faulkner. The seventh assignment of the Gulf Refining Com-

pany purports to adopt the seventeenth and eighteenth assignments of Bridgewater and Ingram.

The record with respect to the argument of Mr. Turner is as follows:

"Argument of Sam R. Turner:

"Look to the doctors' testimony, gentlemen, if there ever was a bright little lad, this little youngster is and was at the time, and how they tried, how rigidly they cross-examined and the more they cross-examined the worse it became; this doctor said yes, this little plaintiff is permanently injured and each of you saw how he demonstrated there on that table that the little boy couldn't lift that injured leg up and when he walked upstairs he would bring it up in a dragging way.

"How would you like for one of your sons to be permanently injured by the effect of a driver's negligence and to go through life in that manner?

"Mr. Finley: We object to that Your Honor.

"The Court: Sustained, it is not a question of what the jury would like to happen to one of its own sons.

"Mr. Finley: You are trying to inflame the jury.

"Mr. Turner: If the Court thinks it was not proper, I will respectfully ask the Court to withdraw it from the consideration of the jury.

"The Court: I have done that already.

"Mr. Turner: Just give absolutely justice, Gentlemen of the Jury, listen solely to the charge of His Honor, the Court, the law must be upheld. Don't go off on the theory that one of the defendants is a corporation. Dispense justice as between man and man and I assure you that the plaintiff will be satisfied, Gentlemen, I am not only talking for this little plaintiff, I am talking for those lads that are on this earth and that are yet to be; those children that gladden the hearthstone and bring joy to the fireside of every horny-handed son of toil in Wilson County, I am talking for them and they must be protected from reckless and negligent drivers that drive cars and trucks on roads in such a negligent, and unlawful manner, as that they are a menace to life and limb and are nothing more than potential murderers and I have faith and confidence in your ability.

"Mr. Finley: (Interrupting) I object to that Your Honor.

"Mr. Hinson: Your Honor, at this point I would like to ask on behalf of the Gulf Refining Company, that the jury be excused.

"Mr. Faulkner: No, go ahead.

"Mr. Hinson: On behalf of the Gulf Refining Company we move at this time for a mistrial in this cause, because the appeal

of the counsel speaking before the jury, representing the plaintiff, is one that would be wholly unjustifiable; there being no element of punitive damages proven, and for the further reason that it is an inflammatory mode and method and wording of speech, calculated to excite on the one hand the sympathy of the jurors, and on the other hand their passion and prejudice.

"Mr. Finley: I want to make the same motion on the same grounds as stated by Mr. Hinson for Mr. Bridgewater and Mr. Ingram, the other two defendants.

"The Court: The motion made by counsel for defendants is overruled, and counsel is admonished not to use inflammatory language criticizing the defendants, and the jury is instructed to disregard anything of that kind.

"Mr. Finley: The defendants Bridgewater and Ingram except to the action of the Court in refusing to enter a mistrial for the reasons stated.

"Mr. Hinson: Enter the same exception for the Gulf Refining Company."

The trial court had permitted Dr. Doak to "demonstrate" the plaintiff on a table before the jury, and it was, therefore, not improper for counsel to refer to this "demonstration" and the doctor's testimony in connection therewith.

The question asked the jury by Mr. Turner, viz: "How would you like for one of your sons to be permanently injured by the effects of a driver's negligence and to go through life in that manner," was improper, but it was, on objection by defendants, so held by the trial judge, and was withdrawn by counsel and the Court. In view of this action of the Court and counsel, we do not think there is any good reason to assume that the defendants were harmed by the question of counsel thus propounded to the jury.

The reference by counsel to "reckless and negligent drivers" who are "a menace to life and limb and are nothing more than potential murderers" was doubtless understood by the jury as counsel's characterization of defendant Ingram; otherwise it would have had no relevancy to the case on trial. We find nothing in the record which justified the denunciation of Ingram as a "potential murderer," and it was, therefore, improper for counsel to use such intemperate and inflammatory language. Pearson v. State, 143 Tenn., 385, 390, 226 S. W., 538.

But the trial judge admonished counsel not to use inflammatory language criticizing the defendants, and instructed the jury "to disregard anything of that kind," and the only exception reserved by the defendants in this connection was to the action of the Court in refusing to enter a mistrial, which we do not think was error under the circumstances disclosed by the record.

The record of General Faulkner's argument, and the objection thereto, is as follows:

"The fact is, Gentlemen of the jury,—the proof is, that he said it was my fault. He just had to admit this. The very thing itself spoke. The circumstances were there to speak for themselves. I don't believe he would have admitted it if everybody there had not seen it. He just had to admit it, that is the truth of it. What he did say, and there were good men that saw it, was, my brakes wouldn't hold. Now, you have no right to give him a car to kill anybody, but he is not being tried for murder. He is only being tried in a civil case and for his negligence, and, of this, the Court will charge you.

"Mr. Finley: On that proposition I understand Your Honor to rule that that evidence is admissible as against Bridgewater.

"The Court: I have admitted it and I will instruct the jury with reference to it. It is depending on what the jury may or may not find. To which action of the Court the defendants and each of them then and there duly excepted.

"Mr. Faulkner: Gentlemen, defendants' counsel even asked you, when the jury was being passed on, if one of the defendants being a corporation would influence your verdict. I have said nothing about a corporation. I don't care whether it is a corporation or an individual. They are afraid you would be prejudiced on account of one of defendants being a corporation. I am going to appeal to you not to be prejudiced on this account, but to try the case as between man and man.

"Mr. Finley: We object to that.

"The Court: Overruled, go ahead.

"Action of Court excepted to by all defendants."

That part of the above quoted argument which manifestly refers to the statements attributed to Ingram by plaintiff's witnesses was not improper because the trial court had, over defendants' objection, permitted the plaintiff to introduce evidence of such statements. We have held that such ruling was erroneous, but it does not follow that it was improper for counsel to discuss and rely upon testimony thus admitted at the trial.

In disposing of the ground of the motion for a new trial based on the second of the two excerpts from General Faulkner's argument above quoted, the trial judge said:

"Now with reference to the argument said to have been made by senior counsel for plaintiff, that this is not a murder case but a civil action; there is a good deal of difference in the tone and circumstances under which a thing was said to the effect. As the Court now recalls it General Faulkner was addressing himself rather to the incident that had occurred with reference

to objectionable argument made by Mr. Turner; he was assuring the jury that there was no criminal charge in this case, merely a cause for damage, personal injury. As the Court sees it, it does not lay stress upon any possible criminality on the part of the defendant Ingram but rather to the contrary. Of course, you can read it differently, depending upon where you put the emphasis, the circumstances that the Court and jury saw as the thing occurred controls how you are to understand what it meant. That's what the Court understood General Faulkner to be saying at that particular time, rather an explanation than anything else; the further withdrawal of what his associate counsel, Mr. Turner, said with reference to recklessness, reckless drivers being potential murderers; he rather in that connection assured the jury that plaintiff was not making any insistence of that kind, that there had been any crime committed, that any of the defendants were guilty of any crime, but simply a lawsuit to determine the liability for the damages, if any, incurred by the plaintiff.''

The trial judge saw and heard counsel make the statements which are criticized by the assignments of error now under consideration, and we accept his undisputed findings with respect to the tone and manner of the speaker, and also the interpretation placed by the trial court upon the counsel's statements in question.

The Gulf Refining Company's seventh assignment and the seventeenth and eighteenth assignments of Bridgewater and Ingram are overruled.

Through the eighth assignment of the Gulf Refining Company and the sixth assignment of Bridgewater and Ingram complaint is made of the refusal of the Court to delay the trial of the case, upon the application of defendants, until the arrival of Dr. Sayers of Nashville and Dr. Robbins of Gallatin. The defendants desired to examine these doctors as expert medical witnesses, but they had not been subpoenaed. The record contains no showing, either on the hearing of the motion for a new trial or otherwise, that Dr. Sayers and/or Dr. Robbins would have attended the trial within any reasonable time if the Court had delayed the hearing as requested, but the bill of exceptions contains a recital, over the signature of the trial judge, as follows:

"When the defendants had neared the end of their proof they asked the Court for indulgence that they might have Doctor Sayers of Nashville and Doctor Robbins of Gallatin. It appearing that neither one had been subpoenaed and that neither one was within the County of Wilson at that time. It was suggested by the defendants' counsel that Doctor Sayers would appear in Lebanon on the three o'clock bus. Over the exception

of plaintiff the Court granted a recess of something like an hour until after three o'clock, but the said Sayers did not appear, but the Court continued to wait for the two physicians until very late in the afternoon and they neither appeared and neither having ever appeared in Court at this term to give his deposition, the Court concluded the case without their appearance.''

This was a matter peculiarly within the discretion of the trial court, and we find no evidence of an abuse of that discretion in this instance. The Gulf Refining Company's eighth assignment and the sixth assignment of Bridgewater and Ingram are overruled.

The assignment numbered eight in the assignments of error filed on behalf of Bridgewater and Ingram obviously relates to an asserted error which, if error at all, is available to Ingram alone. This assignment is as follows:

"The Court committed affirmative error in his charge to the jury, as follows:

" 'If you find from all of the proof, from a preponderance of all the proof, that is from the greater weight of the proof, that the plaintiff was free from any contributory negligence that may have entered into the accident and injury complained of, and that the on-coming oil truck, driven by the defendant Ingram, was being driven at such a rate of speed as to constitute careless or reckless driving, and that, his brakes, the brakes on the automobile were defective, and that he knew them to be defective, or should have known it under the exercise of ordinary care; and that the oil truck ran into and collided with the car occupied by the plaintiff, by reason of the negligent driving of defendant Ingram, and by reason of the faulty condition of the brakes, he knowing them to be in that condition, or having good reason to know and he should have known, by the exercise of due diligence that they were in faulty condition, then the defendant Ingram at least would be liable, because that would mean that the accident was attributable to the negligence of Ingram.' (R. 303-304).

"This charge is erroneous because it is based in part on improper admission of evidence, over the objection of defendants, of statements made by defendant Ingram, the oil truck driver, a short time after the accident, as to the defective condition of the brakes on the oil truck. There was no evidence to justify this charge as to speed of the oil truck. There was no evidence of defective condition of brakes, except the statements attributed to Ingram, a short time after the accident, and these statements were incompetent, because not a part of the res gestae.''

We have held, in disposing of previous assignments of error in this case, that, against defendant Ingram, it was competent for the

plaintiff to prove Ingram's statements made after the collision as admissions against his interest. It follows that the portion of the Court's charge copied into the eighth assignment, supra (which related solely to the liability of Ingram), was not based on improper admission of evidence.

We have also heretofore held that it was for the jury to determine whether or not Ingram was driving at a greater speed than was reasonably consistent with the safety of others, under the circumstances and conditions surrounding him at the time he approached and reached the scene of the collision. Defendant Ingram's eighth assignment of error is overruled.

The assignment numbered nine in the assignments filed on behalf of Bridgewater and Ingram is based upon an instruction to the jury which relates to the liability of Bridgewater alone, and is, therefore, available only to Bridgewater. Through this assignment it is asserted that the trial judge committed affirmative error in that part of his charge as follows:

"If the defendant Ingram under such circumstances as that, was upon the business of the defendant Bridgewater, that is, if he had an interest in the business, even though he was an agent of the Gulf Refining Company, if he was interested in the business in such a way as that he had the right to exercise control over the defendant Ingram, and if it was his duty, and if you should so find under the proof and the instruction that it was his duty, regardless of whether he was an independent contractor or an agent, to furnish safe equipment so far as he was able to do so by the exercise of due diligence, if you should find that Ingram as I have heretofore started to explain to you, was operating on this occasion as the servant and agent of Bridgewater and was under Bridgewater's direction and control, and that the defendant Bridgewater, whether an independent contractor or an agent, having an interest in the business, had the right to direct, and had the right at that time to supervise his equipment and look to its condition, as to whether it was safe or unsafe then the defendant Bridgewater would be liable, if liability is fixed on Ingram."

(We have copied from the charge as it appears in the bill of exceptions, as the quotation in the ninth assignment of error does not appear to be an accurate copy of the charge, which inaccuracy, we assume, has resulted from clerical errors of the copyist).

We think the jury might well have understood from the instruction just quoted that if it was the duty of Bridgewater to furnish to Ingram "safe equipment" for the delivery of oil, gasoline, etc., and to look to its condition as to whether it was safe or unsafe, then he (Bridgewater) would be liable, "if liability is fixed on Ingram,"

regardless of whether this duty rested upon Bridgewater as an independent contractor or as an agent of the Gulf Refining Company. This, in our opinion, was error. If Bridgewater was merely the agent of the Gulf Refining Company, then Bridgewater could not be held liable for the negligence of Ingram under the doctrine of respondeat superior. Lumber Co. v. Sessler, 128 Tenn., 665, 672, 163 S. W., 812, Anno. Cas., 1915-C, 103; L. & N. R. Co. v. Blair, 4 Baxt., 407.

If Bridgewater did not know and had no reason to believe that the brakes on the truck driven by Ingram were defective, the ruling in Gamble v. Vanderbilt University, 138 Tenn., 616, 635, 200 S. W., 510 (where it was held that members of an Executive Committee acting as agents of Vanderbilt University were liable for injuries suffered by Mr. Gamble as a result of the defective condition of an elevator operated by a servant of the University employed by said Executive Committee), does not control the instant case, for the Court there said, "the case must turn on the defective condition of the elevator and the use of it in that condition with the knowledge and assent of the committee in charge, and, in effect, under their continuing order, with the resulting injury."

The instant case (as against Bridgewater) is governed by the rule announced in Drake v. Hagan, 108 Tenn., 265, 269, 67 S. W., 470, wherein it was held that, although an agent is responsible to third persons for the consequences of misfeasance or positive wrong in the performance of duty resulting in injury to such third persons, he is not responsible to third persons, but to his principal only, for the consequences of nonfeasance, or mere omission in the performance of duty. See also 2 C. J., p. 828. The ninth assignment of error is sustained for the reason stated, without discussing other criticisms of the instruction challenged by that assignment.

The tenth assignment of Bridgewater and Ingram is that the trial court committed affirmative error in his charge to the jury as follows:

"But, if he was the agent, Bridgewater was the agent of the Gulf Refining Company, and Ingram was acting under him, as the agent of the Gulf Refining Company, then the statements made by Ingram with reference to the circumstances as to how the accident occurred which had been admitted in the proof would be competent so far as the Gulf Refining Company is concerned."

We see no ground upon which Bridgewater and Ingram may rightfully complain of the instruction just quoted, as it is limited in its effect to the Gulf Refining Company. The tenth assignment is, therefore, overruled.

The eleventh assignment is that the trial court erred in refusing to give in his charge to the jury defendant Bridgewater's special request No. 1, as follows:

"If you find from the preponderance of the evidence that Bridgewater was merely the agent of the Gulf Refining Company, and if you further find from the preponderance of the evidence, that Bridgewater was not present when the accident occurred, and that he was not negligent in employing the driver, Ingram, or in retaining him in his service, and that he had no knowledge of any defect of any kind in the brakes on the truck and that he was not negligent in failing to have said brakes inspected and adjusted, only a short time before the accident, then Bridgewater as such an agent of the Gulf Refining Company would not be liable in this case, unless you find from a preponderance of the testimony that he was guilty of actual wrong-doing in connection with this accident and injury."

The instruction embodied in the foregoing request contained a theory of the case supported by evidence which, if found to be true, would have justified a verdict for defendant Bridgewater under the authorities cited in our discussion of the ninth assignment of error, supra. We have not found such an instruction or its equivalent in the charge given to the jury, and we hold that it was error to refuse this request. The eleventh assignment of error is sustained.

The twelfth assignment is that the trial court erred in refusing to give in charge to the jury defendant Bridgewater's special request No. 2, as follows:

"If you find from the preponderance of the evidence that the defendant, Bridgewater, was merely an agent or servant of the Gulf Refining Company, and not an independent contractor and that he, himself, was not present when the accident occurred, and was not guilty of negligence, then in that event, he would not be liable in this case."

The instruction thus requested is included in request No. 1 copied into the eleventh assignment, supra, and is sound as far as it goes, but without the qualifications stated in request No. 1, might have been misleading to the jury and should not have been charged. The twelfth assignment is overruled.

The twentieth assignment of Bridgewater and Ingram is that the trial court erred in overruling their motion for a new trial.

This assignment is too general to be considered, and is for that reason overruled. Thurman v. Bradford, 3 Hig., 474; 2 Ency. of Pl. & Prac., p. 953.

This disposes of all the assignments of error. The second, third and fourth assignments of the Gulf Refining Company, and its fifth assignment insofar as said fifth assignment questions the competency of Dr. Loring's testimony, are sustained.

The second, fifth, ninth and eleventh assignments of Bridgewater and Ingram are sustained, and their seventh, fourteenth, fifteenth and

sixteenth assignments are sustained insofar as they are made on behalf of defendant Bridgewater.

The sixth assignment of the Gulf Refining Company and the nineteenth assignment of Bridgewater and Ingram are pretermitted. The assignments not sustained or pretermitted as above stated are overruled.

It results that, for the errors pointed out by the assignments which we have sustained, the judgment of the Circuit Court is reversed, the verdict of the jury is set aside, and the cause will be remanded to the Circuit Court of Wilson County for a new trial.

The costs of the appeal will be adjudged against A. L. Frazier, the plaintiff's next friend and surety on his cost bond below. (Ogg v. Leinart, 1 Heisk., 40; W. S. Knight v. W. A. Taylor, Shelby Law, opinion by Mr. Chief Justice Green, May 30, 1927, holding that the rule of Ogg v. Leinart, supra, extends to law cases since the Act of 1917, ch. 107). The costs accrued in the Court below will await the future judgment of that Court.

Crownover and DeWitt, JJ., concur.